## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| ULYSSES WILKERSON, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | |
| | ) | **2:19-CV-00898-MHT-SMD** |
| BRANDON HICKS, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION
## TO DISMISS SECOND AMENDED COMPLAINT

Attorney for Defendant Brandon Hicks:

James H. Pike
SHEALY, PIKE, HORNSBY & FREEMAN
P.O. Box 6346
Dothan, Alabama 36302-6346
Tel. (334) 677-3000
Fax (334) 677-0030
Email: jpike@shealypikelaw.com

Attorney for Defendants Barry Rodgers, Jason Barron, Brandon Kirkland, and Michael Watts:

Randall Morgan
HILL, HILL, CARTER, FRANCO, COLE & BLACK, P.C.
425 South Perry Street
Montgomery, Alabama 36104
Tel. (334) 834-7600
Fax (334) 263-5969
rmorgan@hillhillcarter.com

# Table of Contents

I.   Introduction................................................................................1

II.  The Factual Allegations ........................................................2

III. The Framework for Analysis ................................................8

    A.  The Failure-to-State-a-Claim Standard ...........................8

    B.  The Court May Consider the Body-Worn Camera Recordings and the Adjudication of Delinquency Without Converting This Motion to Dismiss Into a Summary Judgment Motion ..............................10

IV. The Fourth Amendment Claims ........................................12

    A.  The Qualified Immunity Defense..................................14

    B.  The Heck Doctrine Prevents Plaintiffs From Relitigating Issues Necessarily Decided by Wilkerson's Adjudication of Delinquency..................................................................18

       1.  The Heck Doctrine Prevents Plaintiffs From Relitigating the Lawfulness of Wilkerson's Arrest............................................19

       2.  Heck's Inconsistent-Factual-Allegations Rule Prevents Plaintiffs From Relitigating the Issues of Whether the Officers Had a Lawful Basis to Detain Wilkerson and Whether Wilkerson Resisted Handcuffing.............................................22

    C.  The Doctrine of Collateral Estoppel Precludes Plaintiffs from Relitigating Issues of Fact or Law That the State Court Necessarily Decided Against Wilkerson ......................................25

    D.  All Officers Are Entitled to Qualified Immunity Against Wilkerson's § 1983 False Arrest Claim ....................................32

    E.  All Officers Are Entitled to Qualified Immunity Against Wilkerson's § 1983 Excessive Force Claim................................35

       1.  Plaintiffs Cannot Relitigate the Manner in Which Wilkerson Obstructed Governmental Operations and Resisted Arrest .................36

2.   The   Officers   Did   Not   Violate   Wilkerson's   Fourth Amendment Right Against Excessive Force............................................41

3.   The  Officers  Did  Not  Violate  a  Clearly  Established  Right Against Excessive Force ........................................................................58

V.  The State Law Claims.........................................................................................62

   A.  The Officers Did Not Commit the Tort of Assault-and-Battery .................63

   B.  The Officers Are Entitled to State-Agent Immunity ....................................64

VI. Conclusion .........................................................................................................68

VII.    Certificate of Service .....................................................................................69

# I.    Introduction

This case involves a police officer's right to use physical force to control an offender who the officer reasonably believes is reaching for a weapon.  This action arose from plaintiff Ulysses Wilkerson's arrest in late 2017.  (Doc. 48 at 4-5, ¶¶ 16, 20.)  The plaintiffs are Wilkerson and his mother, Angela Williams.  (Doc. 48 at 2, ¶¶ 4, 6, 7.)  The defendants are Brandon Hicks, Barry Rodgers, Jason Barron, Brandon Kirkland, and Michael Watts.  (Doc. 48 at 1, ¶ 1.)  During the events in question, the defendants were employed as police officers by the City of Troy, Alabama.  (Doc. 48 at 3, ¶ 8.)

Plaintiffs filed this action on November 18, 2019.  (Doc. 1 at 1.)  They originally sued the defendants in their official capacities only.  (Doc. 1 at 1.)  On November 22, 2019, Plaintiffs filed a First Amended Complaint that added individual capacity claims against each defendant.  (Doc. 5.)  The defendants jointly moved to dismiss the First Amended Complaint.  (Doc. 23.)  In response to the motion to dismiss, Plaintiffs sought leave to file their Second Amended Complaint.  (Doc. 35.)  On March 11, 2021, the Court granted leave to file the Second Amended Complaint.  (Doc. 47.)  Plaintiffs filed the Second Amended Complaint on March

19, 2021.  (Doc. 48.)  This Motion relates to the Second Amended Complaint.[1]  (Doc. 48.)

## II.   The Factual Allegations[2]

The Complaint makes the following allegations, as supplemented by Wilkerson's adjudication of delinquency and two police video recordings.  (Exs. 1-5.)   After 11:00 p.m., on December 23, 2017, Wilkerson was walking alone in downtown Troy when the defendant officers allegedly exited their patrol cars and approached him.  (Doc. 48 at 4-5, ¶¶ 16-17.)  Wilkerson fled from the officers on foot for several blocks.  (Doc. 48 at 5, ¶ 17.)   The officers allegedly stopped Wilkerson and placed him under arrest.  (Doc. 48 at 5, ¶ 20.)  One or more of the officers allegedly threw Wilkerson to the ground.  (Doc. 48 at 5-6, ¶ 23.)  Wilkerson physically resisted handcuffing by reaching under his body.  (Ex. 1 at 3-4.)  The Complaint alleges that one or more of the officers struck and kicked Wilkerson's head and face, (Doc. 48 at 5-6, ¶ 23), but these are conclusory allegations, see Teal v. Campbell, 603 Fed. App'x 820, 823 (11th Cir. 2015) (characterizing the phrase

---

[1] Because the Second Amended Complaint (Doc. 48) is now the operative pleading, this Memorandum refers to it as "the Complaint."  See Lowery v. Alabama Power Co., 483 F.3d 1184, 1219 (11th Cir. 2007) ("an amended complaint supersedes the initial complaint and becomes the operative pleading in the case").

[2] This Memorandum recites the Complaint's factual allegations because they are the operative facts at the motion-to-dismiss stage.  See Speaker v. U.S. Dep't of Health and Human Servs. Ctrs. for Disease Control and Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010) ("In ruling on a 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff.").  They are not the actual facts.

"stomped and kicked numerous times" as "conclusory allegations . . . with respect to the amount of force applied"). Wilkerson actively resisted the officers' efforts to subdue him. (Doc. 48 at 6, ¶ 28.) All uses of force against Wilkerson terminated once the officers gained control of his hands. (Ex. 2 at 23:56:09; Ex. 3 at 00:54:52; Ex. 4 at 23:56:15:00; Ex. 5 at 23:56:15:00.) Wilkerson allegedly sustained cuts, bruises, broken bones, and other injuries to his body, head, and face. (Doc. 48 at 6, ¶¶ 24, 27.)

As a result of the incident, Wilkerson was adjudicated delinquent by the state juvenile court. This Court has taken judicial notice of the adjudication of delinquency by the Alabama Court of Criminal Appeals. (Doc. 47 at 3-4.) The Alabama Court of Criminal Appeals' opinion recounts the record evidence upon which the adjudication was based:

> The evidence adduced at the delinquency hearing indicated that on the night of December 23, 2017, officers with a Special Enforcement Unit ("SEU") of the Troy Police Department ("TPD") were performing a special detail. The officers were patrolling near the area of downtown Troy in response to a recent increase in vehicle break-ins and reports of several stolen cars in the area. As part of the duties of the SEU, officers were to gather information from individuals that the officers had contact with in the designated areas patrolled by the SEU and fill out a field contact card. The purpose of the field contact cards was to provide a reference to officers of possible suspects or individuals who had been in the area in the event of a business or vehicle break-in or other criminal activity.
>
> Sergeant Barry Rodgers and Officer Jason Barron with the TPD were patrolling a business district within the area designated by the SEU on the night of December 23, 2017. Sgt. Rodgers was driving an unmarked

3

patrol vehicle and Officer Barron was in the passenger seat of the unmarked patrol vehicle. A few minutes prior to midnight, Sgt. Rodgers observed a person walking out from behind a closed business within the area. Sgt. Rodgers initiated the red and blue lights on his patrol vehicle as he approached the person and pulled up near the individual to make contact. The individual was a black male wearing a dark hoodie and dark pants. As the officers approached, the individual "took off running in the direction that he came from." (R. 49.) Officer Barron exited the patrol vehicle and pursued the individual on foot. Sgt. Rodgers testified that, based on his background, training and experience in law enforcement, when a subject runs from him, "there's a reason he's running . . . And it's typically they have warrants or dope or something, some kind of illegal item on their person, or – they're running for a reason." (R. 49-50.) Sgt. Rodgers turned his vehicle around and approached from a different direction in an attempt to set up a perimeter in order to box in the fleeing subject. Sgt. Rodgers and Officer Barron were updating dispatch regarding the whereabouts of the subject.

Officer Barron informed Sgt. Rodgers over the radio that the subject was behind The Front Porch bar. Sgt. Rodgers went to that location, turned off the vehicle's lights, and exited his vehicle. As Sgt. Rodgers was looking for the subject, he observed him running across the parking lot in front of The Front Porch. Sgt. Rodgers told the subject, later identified as U.W., to stop and warned him that he would be tased if he did not stop. U.W. failed to stop initially and Sgt. Rodgers retrieved his taser from its holster. U.W. then stopped and began to get down on one knee. Sgt. Rodgers believed U.W. was surrendering at that point, so he holstered his taser and pushed U.W. to the ground. U.W. was lying on his stomach on the ground and Sgt. Rodgers placed himself on top of U.W.'s lower back and buttocks area in an attempt to gain control over U.W.'s body. Sgt. Rodgers retrieved his handcuffs and was able to place one handcuff on U.W.'s right wrist. U.W. then began twisting and turning. A struggle ensued as Sgt. Rodgers tried to gain control of U.W.'s left arm to place the handcuff on his left arm. Sgt. Rodgers testified that U.W. was jerking, pulling, and doing everything he could to get away from Sgt. Rodgers's grasp.

According to Sgt. Rodgers, Sgt. Hicks arrived shortly after he began handcuffing U.W. Sgt. Hicks was screaming at U.W. to stop resisting.

4

During the struggle, Sgt. Rodgers perceived U.W. to be trying to reach underneath his body.  Sgt. Hicks placed his knees on the top part of U.W.'s shoulders as the officers tried to maintain control of U.W.'s right arm and gain control over U.W.'s left arm.  Sgt. Hicks continued to issue verbal commands for U.W. to stop resisting, and eventually issued four or five "jabs" to U.W.'s face in an attempt to get U.W. to relent.  (R. 60.)

According to Sgt. Rodgers, Officer Brandon Kirkland and Officer Michael Watts arrived at the scene and were able to assist the other officers in getting U.W.'s left arm behind his back and in handcuffs.  Once the handcuffs were on U.W., the officers got off U.W., rolled him over to his back, and helped him sit up.  The officers called for the fire department and an ambulance to respond to the scene and assist in first aid; however, when the fire department and ambulance arrived, they advised Sgt. Rodgers that there was nothing they could do to assist U.W. for any kind of medical condition and that there was no reason to transport U.W. by ambulance to a hospital.  Sgt. Rodgers directed other officers to immediately transport U.W. to Troy Regional Emergency Room, where U.W. received medical assistance.  Sgt. Rodgers also testified that because U.W. fled from the officers when they initially approached him behind the businesses, U.W. prevented him from performing his duty to obtain a field contact card or field report.

A copy of Sgt. Rodgers's body camera footage taken during the incident was played for the court and introduced into evidence.  Sgt. Rodgers stated that, when he began running after U.W., his body cam fell to the ground; however, according to Sgt. Rodgers, you could still hear events on the camera footage.

Officer Barron also testified about the incident.  Officer Barron recalled that he and Sgt. Rodgers approached U.W. behind the closed businesses.  As the officers approached and initiated the emergency lights on the vehicle, Officer Barron began to exit the vehicle and the subject took off running.  Officer Barron testified that he told U.W. to stop running and warned U.W. that he would be tased if he did not stop.  Officer Barron testified that he continued to chase U.W. until he got near the Front Porch and he lost sight of U.W.  Officer Barron informed the other officers of his location, and shortly thereafter, he heard the other officers yelling commands to U.W.  Officer Barron then joined

5

the other officers as they attempted to arrest U.W.  A video recording of Officer Barron's body camera was played for the court.

Officer Brandon Kirkland with the TPD testified that he arrived at the scene of the incident when the officers were struggling with U.W. in an attempt to place a handcuff on U.W.'s left arm.  Officer Kirkland claimed that U.W. kept placing his arm under himself so that the officers could not get his arm.  Officer Kirkland stated that when Sgt. Hicks would tell U.W. to stop resisting, Sgt. Hicks would also punch U.W. in the face.  A video recording taken from Officer Kirkland's body camera, as well as a recording from Officer Kirkland's patrol vehicle, were played for the court.

Officer Michael Watts with the TPD also arrived during the struggle to place the handcuffs on U.W.  Officer Watts stated that U.W. had his left hand underneath his body and kept trying to pull away from Sgt. Rodgers in what Officer Watts believed could have been an attempt to "try to grab something," but that it was also an "attempt to keep from being detained at that time."  (R. 147.)  According to Officer Watts, U.W. was also flailing and kicking his legs.  Officer Watts observed U.W. being hit in the face by one of the other officers as well.  Officer Watts ran up to the officers and U.W.  Officer Watts stated that he was able to reach "into the pile" and place the handcuff on U.W.'s left arm.  (R. 145.)  Officer Watts testified that he then pulled U.W. up from the ground and leaned U.W. on his leg to make sure that U.W. was okay.

(Ex. 1 at 1-5.)  Based on this evidence, the state court adjudicated Wilkerson

delinquent for committing the offenses of obstructing governmental operations in

violation of Alabama Code § 13A-10-2(a) and resisting arrest in violation of

Alabama Code § 13A-10-41.  (Ex. 1 at 1.)

In the state court proceedings, Wilkerson fully litigated the lawfulness of his

arrest on both charges.  (Ex. 1 at 5.)  Wilkerson argued that he could not be guilty of

obstructing governmental operations because the officers were performing "an

unconstitutional, suspicion-less investigatory stop under the purview of Terry v.

6

Ohio, 392 U.S. 1 (1968)."  (Ex. 1 at 5.)  Regarding the resisting arrest charge, Wilkerson argued that his arrest for obstructing governmental operations was unlawful and, therefore, he could not be guilty of resisting arrest.  (Ex. 1 at 5.)  The state court ruled, "the basis of [Wilkerson's] entire argument as to both charges is without merit."  (Ex. 1 at 9.)

In this § 1983 action, Plaintiffs' most recent complaint asserts four claims.  In Count I, Wilkerson asserts a § 1983 claim against all defendants for false arrest under the United States Constitution's Fourth Amendment.  (Doc. 48 at 7, ¶¶ 29-32.)  In Count II, Wilkerson asserts a § 1983 claim against all defendants for excessive force under the Fourth Amendment.  (Doc. 48 at 7-8, ¶¶ 33-36.)  In Count III, Wilkerson asserts a state law claim against all defendants for assault and battery.  (Doc. 48 at 8-9, ¶¶ 37-39.)  In Count IV, Wilkerson's mother, Angela Williams, asserts a state law claim against all defendants for loss of services, medical expenses, and other damages.[3]  (Doc. 48 at 9, ¶¶ 40-44.)  None of these counts states a claim upon which relief can be granted and the defendants are entitled to immunity against all claims.

---

[3] Williams invokes a state statute that authorizes a custodial parent to sue for injury to a minor child: "A father or a mother, provided they are lawfully living together as husband and wife, shall have an equal right to commence an action for an injury to their minor child, a member of the family; provided, however, that in the event such mother and father are not lawfully living together as husband and wife, or in the event legal custody of such minor child has been lawfully vested in either of the parties or some third party, then and in either event the party having legal custody of such minor child shall have the exclusive right to commence such action."  Ala. Code § 6-5-390 (Westlaw 2021).

### III.   The Framework for Analysis

The Court should dismiss this action because: (1) the officers enjoy qualified immunity against both § 1983 claims; (2) the Complaint does not state a claim under state law upon which relief can be granted; and (3) the officers enjoy State-agent immunity against the state law claims.

### A.   The Failure-to-State-a-Claim Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes a party to assert by motion the defense of "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  According to Rule 8, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me allegation."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

"To decide whether a complaint survives a motion to dismiss, we use a two-step framework."  McCullough v. Finley, 907 F.3d 1324, 1333 (11th Cir. 2018).  "A district court considering a motion to dismiss shall begin by identifying conclusory allegations that are not entitled to an assumption of truth – legal conclusions must be supported by factual allegations."  Randall v. Scott, 610 F.3d 701, 709-10 (11th Cir. 2010).  "[T]he tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

"Second, only a complaint that states a plausible claim for relief survives a motion to dismiss."  Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009).  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

Plaintiffs have the burden to plead claims that satisfy the Twombly/Iqbal standard.  See Worthy v. City of Phenix City, 930 F.3d 1206, 1222 (11th Cir. 2019) ("[Plaintiffs] bear the burden of setting forth facts that entitle them to relief."); Davidson v. Maraj, 609 F. App'x 994, 1002 (11th Cir. 2015) (holding plaintiff's

"burden at the motion-to-dismiss stage . . . requires him to allege facts that, taken as true, state a plausible claim for relief"); Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352, 1369 (11th Cir. 2011) ("because they have not met their Twombly and Iqbal pleading burden, we . . . dismiss the entirety of the insurers' claims").  The Complaint does not meet Plaintiffs' burden to state a plausible claim to relief.

**B.    The Court May Consider the Body-Worn Camera Recordings and the Adjudication of Delinquency Without Converting This Motion to Dismiss Into a Summary Judgment Motion**

Defendants have attached two body-worn camera recordings to their motion to dismiss, (Exs. 2 & 3), along with two forensic video files that synchronize the body-worn camera recordings at full speed and in slow motion, (Exs. 4 & 5).  The court may consider the recordings without converting the motion to dismiss into a summary judgment motion:

> Appellant has challenged the district court's reliance on the video footage, which was referenced in the complaint, and attached to defendants' answer.  The district court's consideration of the undisputedly authentic footage was proper.  A court may consider an exhibit attached to a pleading, or a motion to dismiss, without converting the motion into one for summary judgment, where the exhibit is central to the plaintiff's claim, and its authenticity is unchallenged.  See Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002).  Such is the case here.  Appellant objects, arguing that video footage is subject to interpretation; but so too are words.  This Court is capable of construing all ambiguities in the video footage in favor of plaintiff, just as it must, at this stage, construe in plaintiff's favor all ambiguities in the written pleadings, but we are not required to ignore that footage.  See Scott v. Harris, 550 U.S. 372, 380-81, 127 S. Ct. 1769,

167 L. Ed. 2d 686 (2007) (where video footage clearly contradicted plaintiff's allegations, "[t]he Court of Appeals . . . should have viewed the facts in the light depicted by the videotape").

Cantrell v. McClure, 805 F. App'x 817, 819 n.2 (11th Cir. 2020); see also McDowell v. Gonzalez, 820 F. App'x 989, 992 (11th Cir. 2020) ("In reviewing McDowell's complaint to determine whether it should be dismissed under Rule 12(b)(6), the district court properly considered both the amended complaint and body camera footage that was attached to the motion to dismiss because the body camera footage was central to the amended complaint and was undisputed.").

The video recordings override the Complaint's conclusory allegations.  See Scott v. Harris, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals . . . should have viewed the facts in the light depicted by the videotape."); Beshers v. Harrison, 495 F.3d 1260, 1262 n.1 (11th Cir. 2007) ("to the extent Appellant's version of the facts is clearly contradicted by the videotapes, such that no reasonable jury could believe it, we do not adopt his factual allegations"); F.T.C. v. AbbVie Products LLC, 713 F.3d 54, 63 (11th Cir. 2013) ("We . . . treat specific facts demonstrated by exhibits as overriding more generalized or conclusory statements in the complaint itself.").  Accordingly, the Court should credit the video recordings over contradictory allegations in the Complaint.

Defendants have also attached the adjudication of the Alabama Court of Criminal Appeals in U.W. v. State, CR-17-0667. (Ex. 1.) The Court has taken judicial notice of this document. (Doc. 47 at 4.) When the Court decides this motion to dismiss, the Court may consider the adjudication of delinquency without converting the motion to dismiss into a summary judgment motion. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 1499, 2509 (2007) (holding that on motion to dismiss, courts may consider "matters of which a court may take judicial notice"). The adjudication of delinquency supersedes the Complaint's allegations. See F.T.C. v. AbbVie Products LLC, 713 F.3d 54, 63 (11th Cir. 2013) ("We . . . treat specific facts demonstrated by exhibits as overriding more generalized or conclusory statements in the complaint itself.").

## IV.   The Fourth Amendment Claims

In Counts I and II, Wilkerson asserts § 1983 claims for false arrest and excessive force under the United States Constitution's Fourth Amendment. (Doc. 48 at 7-8, ¶¶ 29-36.) The qualified immunity defense bars both claims. See Hunter v. City of Leeds, 941 F.3d 1265, 1278 (11th Cir. 2019) ("Qualified immunity protects a government official from being sued for damages under § 1983 unless preexisting law clearly establishes the unlawfulness of his actions, such that any reasonable official in his position would be on notice that his conduct was unlawful.").

12

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "The Fourth Amendment safeguards the rights of the people to be free from unreasonable searches and seizures."  United States v. Yarbrough, 961 F.3d 1157, 1163 (11th Cir. 2020).  "The Fourth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment."  United States v. Campbell, 970 F.3d 1342, 1347 n.4 (11th Cir. 2020).  "It must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures."  Elkins v. United States, 364 U.S. 206, 222, 80 S. Ct. 1437, 1446 (1960).

Wilkerson's Fourth Amendment false arrest and excessive force claims implicate both prongs of the Supreme Court's "dual inquiry" into the reasonableness of a seizure: "in determining whether [a] seizure and search were 'unreasonable' our inquiry is a dual one – whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry v. Ohio, 392 U.S. 1, 19-20, 88 S. Ct. 1868, 1879 (1968).  Searches and seizures must be "reasonable, both at their inception and as conducted."  Terry v. Ohio, 392 U.S. 1, 27-28, 88 S. Ct. 1868, 1883 (1968).

13

Wilkerson's false arrest claim requires the court to determine whether Wilkerson's seizure was "justified at its inception." New Jersey v. T.L.O., 469 U.S. 325, 341, 105 S. Ct. 733, 742-43 (1985) (quoting Terry, 392 U.S. at 20, 88 S. Ct. at 1879). Wilkerson's excessive force claim requires the court to determine whether the officers conducted Wilkerson's seizure in a reasonable manner:

> Thus, an initially constitutional seizure can become unconstitutional where it is executed in an extraordinary manner, thereby subjecting the officer's conduct to a balancing analysis. While usually evaluated in the context of excessive force, that is not the only way that an otherwise authorized seizure might be conducted in such an extraordinary manner so as to constitute a constitutional violation.

May v. City of Nahunta, 846 F.3d 1320, 1330 (11th Cir. 2017). The following analysis explains that neither of Wilkerson's Fourth Amendment claims are viable.

## A.   The Qualified Immunity Defense

Brandon Hicks, Barry Rodgers, Jason Barron, Brandon Kirkland, and Michael Watts invoke the qualified immunity defense against all § 1983 claims. "Section 1983 creates a private civil rights cause of action for the deprivation of federal rights by persons acting under color of state law."[4] Brooks v. Warden, 800 F.3d 1295, 1300 (11th Cir. 2015). "Government officials sued for acts committed in the course

---

[4] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983 (Westlaw 2021).

14

of their official duties may invoke the defense of qualified immunity." O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004).

"Qualified immunity is an immunity from suit rather than a mere defense from liability." McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007). "The purpose of qualified immunity is to ensure that officials are not deterred or distracted from carrying out their official duties because of fear of a later lawsuit." Robinson v. Arrugueta, 415 F.3d 1252, 1257 n.5 (11th Cir. 2005). "The qualified immunity inquiry involves three steps: (1) the alleged conduct must fall within the scope of the discretionary authority of the actor; (2) if it does, we must then determine whether that conduct violates a constitutional right; (3) if so, we must inquire whether the asserted right was clearly established at the time of the alleged violation." Tinker v. Beasley, 429 F.3d 1324, 1326 (11th Cir. 2005).

"To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'" Crosby v. Monroe Cty., 394 F.3d 1328, 1332 (11th Cir. 2004) (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004)). "Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir.

2004).  "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances."  Id. at 1266.

"In assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures is a part of his job-related powers and responsibilities."  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004).  "In considering whether an act of allegedly excessive force fell within a police officer's duties, for example, we do not ask whether police have the right to use excessive force."  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004).  "We also do not immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest."  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004).  "We instead ask whether they have the power to attempt to effectuate arrests."  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004).

During the events in question, the officers were performing discretionary functions within their discretionary authority.  The officers "were, at all pertinent

16

times, policemen for the City of Troy [and were] acting under the color of law." (Doc. 48 at 3, ¶ 8.)  The officers engaged in a pursuit.  (Doc. 48 at 5, ¶ 17.)  The officers effected an arrest.  (Doc. 48 at 5, ¶ 20.)  The arrest resulted in the filing of charges against Wilkerson.  (Ex. 1.)  The officers indisputably acted within their discretionary authority during the events in question.  See Grider v. City of Auburn, 618 F.3d 1240, 1267-68 (11th Cir. 2010) ("investigating and prosecuting violations of the law clearly fall within the scope of official duties of a law enforcement officer"); Brown v. City of Birmingham, No. 2:15-CV-01273-SGC, 2017 WL 4264997, at *3 (N.D. Ala. Sept. 26, 2017) ("it is undisputed that investigation, pursuit, apprehension, and arrest of criminal suspects are among a municipal police officer's discretionary functions"); Rogers v. City of Selma, 178 F. Supp. 3d 1222, 1236 (S.D. Ala. 2016) ("It is well established that an arrest is within the discretionary authority of a police officer.").

"Once discretionary authority is established, the burden then shifts to the plaintiff[s] to show that qualified immunity should not apply." Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009).  "To overcome qualified immunity, the plaintiff[s] must satisfy a two prong test; [they] must show that: (1) the defendant[s] violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).  "A qualified-immunity inquiry can

begin with either prong; neither is antecedent to the other." Morris v. Town of Lexington, 748 F.3d 1316, 1322 (11th Cir. 2014).  Before addressing each of the Complaint's claims, however, this Memorandum will discuss how the Heck doctrine and the doctrine of collateral estoppel prevent Plaintiffs from relitigating factual and legal issues that the state court necessarily decided against Wilkerson.

**B.    The Heck Doctrine Prevents Plaintiffs From Relitigating Issues Necessarily Decided by Wilkerson's Adjudication of Delinquency**

"Before [the Court] can decide whether the officers are entitled to qualified based on their conduct, [the Court] must first determine what exactly that conduct was."  Hunter v. City of Leeds, 941 F.3d 1265, 1274 (11th Cir. 2019).  The Heck doctrine prevents Plaintiffs from asserting claims if success on those claims would necessarily imply that the state court's adjudication of delinquency is invalid:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.  A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

Heck v. Humphrey, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 2372 (1994).

The Heck doctrine applies not only to criminal convictions, but also to juvenile delinquency adjudications.  See Henry v. City of Mt. Dora, No. 5:13-CV-528-OC-30PRL, 2014 WL 5823229, at *4 (M.D. Fla. Nov. 10, 2014) ("Although an

18

issue of first impression in this circuit, a majority of courts that have directly considered whether the <u>Heck</u> doctrine applies to juvenile delinquency adjudications have concluded that <u>Heck</u> applies, such that it could bar a juvenile's claims under § 1983 if the remaining elements of the <u>Heck</u> doctrine are met."), <u>aff'd</u>, 688 F. App'x 842, 842 (11th Cir. 2017) ("we find no reversible error in the district court's order dismissing plaintiff's § 1983 false arrest claims against the above officers").[5]

### 1. The <u>Heck</u> Doctrine Prevents Plaintiffs From Relitigating the Lawfulness of Wilkerson's Arrest

The <u>Heck</u> doctrine prevents Plaintiffs from relitigating the lawfulness of Wilkerson's arrest. In <u>Heck</u>, the Supreme Court explained that false arrest claims which follow convictions for resisting arrest are not cognizable under § 1983 when the resisting arrest statute requires a lawful arrest as an element of the offense:

> An example of . . . a § 1983 action that does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful . . . would be the following: A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a *lawful* arrest. (This is a common definition of that offense. <u>See</u> <u>People v. Peacock</u>, 68 N.Y.2d 675, 505 N.Y.S.2d 594, 496 N.E.2d 683 (1986); 4 C. Torcia, Wharton's Criminal Law § 593, p. 307 (14th ed. 1981).) He then brings a § 1983 action against the arresting officer,

---

[5] Defendants acknowledge that in <u>M.D. ex rel. Daniels v. Smith</u>, 504 F. Supp. 2d 1238, 1253 (M.D. Ala. 2007) (Thompson, J.), this court questioned whether *Heck* applies to adjudications of juvenile delinquency. That was ten years before an Eleventh Circuit panel found "no reversible error" in <u>Henry v. City of Mt. Dora</u>'s holding that *Heck* does apply to juvenile delinquency adjudications. Moreover, the same "concerns for finality and consistency" that the Supreme Court identified in *Heck* apply equally to juvenile delinquency adjudications. <u>Heck</u>, 512 U.S. at 485, 114 S. Ct. at 2371.

seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted.  Regardless of the state law concerning res judicata, . . . the § 1983 action will not lie.

Heck v. Humphrey, 512 U.S. 477, 487 n.6, 114 S. Ct. 2364, 2373 n.6 (1994).

The Eleventh Circuit adheres to this principle:

In Heck, the Supreme Court noted that *some* Fourth Amendment claims would, if successful, necessarily imply the invalidity of the conviction because they would negate an element of the offense.  For example, a successful § 1983 claim for unreasonable seizure might negate an element of the offense of resisting arrest.  See Heck, 512 U.S. at 487 n.6, 114 S. Ct. 2364.  Thus, the court must look both to the claims raised under § 1983 and to the specific offenses for which the § 1983 claimant was convicted.

Hughes v. Lott, 350 F.3d 1157, 1161 n.2 (11th Cir. 2003).

A conviction for resisting arrest under a statute like Alabama's bars a false arrest claim.  See Martin v. Dotson, No. 1:16-CV-245-ECM, 2019 WL 1140224, at *8 (M.D. Ala. Jan. 29, 2019) ("For example, if a plaintiff is convicted of resisting arrest, which is defined as preventing an officer from effecting a lawful arrest, then Heck would bar the plaintiff's suit against the officer seeking damages for an unreasonable seizure because success on the plaintiff's claim would negate an element of the offense."), report and recommendation adopted, No. 1:16-CV-245-ECM, 2019 WL 1140187 (M.D. Ala. Mar. 12, 2019); White v. Jones, No. 3:13-CV-00132-WHA, 2016 WL 1051516, at *4 (M.D. Ala. Feb. 23, 2016) ("For example, if a plaintiff is convicted for resisting arrest that is defined as preventing

an officer from effecting a lawful arrest, then Heck would bar the plaintiff's suit against the officer seeking damages for an unreasonable seizure because success on the plaintiff's claim would negate an element of the offense."), report and recommendation adopted, No. 3:13CV-132-WHA, 2016 WL 1048073 (M.D. Ala. Mar. 16, 2016).

The United States District Court for the Southern District of Alabama has applied Heck specifically to Alabama's resisting arrest statute:

> [T]he plaintiff was . . . convicted of resisting arrest, which required the jury to find that she "intentionally prevent[ed] or attempt[ed] to prevent a peace officer from affecting [sic] a lawful arrest" of the plaintiff. Ala. Code § 13A-10-41. The Heck Court expressly addressed such a situation. When (as in Alabama) the crime of resisting arrest includes a "lawful arrest" requirement, a plaintiff bringing a civil challenge to the lawfulness of the arrest (including the existence *vel non* of probable cause to arrest) "would have to negate an element of the [resisting arrest] offense of which he has been convicted," such that "the § 1983 action will not lie." 512 U.S. at 486 n.6. The Eleventh Circuit has repeatedly acknowledged this principle as settled law. E.g., Dyer v. Lee, 488 F.3d 876, 879-80 (11th Cir. 2007); McClish v. Nugent, 483 F.3d 1231, 1250-51 (11th Cir. 2007).
>
> The plaintiff alleges that she was falsely imprisoned in violation of her constitutional rights because the defendants lacked probable cause to arrest her for public intoxication. To prevail on this claim, she would have to prove that her arrest was unlawful, which would necessarily imply the invalidity of her conviction for resisting a lawful arrest. Because the plaintiff's conviction for resisting arrest has not been invalidated, pursuant to Heck her claim is "not cognizable under § 1983." 512 U.S. at 487.

Young v. City of Gulf Shores, No. CIVA. 07-0810-WSM, 2009 WL 920303, at *3 (S.D. Ala. Apr. 2, 2009); see also Styron v. City of Foley, No. CIVA. 03-0572-CG-

L, 2005 WL 3098926, at *7 (S.D. Ala. Nov. 18, 2005) (holding <u>Heck</u> barred

Plaintiffs' false arrest claim because "Plaintiffs' convictions for resisting arrest[ ]

necessarily included as an element that the arrest was lawful.").

Because success on a false arrest claim would necessarily imply that the state

court's adjudication of delinquency for resisting arrest is invalid, Wilkerson's § 1983

false arrest claim is not cognizable in this court.  <u>See</u> <u>Simpson v. Stewart</u>, 386 F.

App'x 859, 860 (11th Cir. 2010) ("If the plaintiff cannot show that his conviction or

sentence has been invalidated, then he is barred from bringing a § 1983 claim for

false arrest.").

> ### 2. <u>Heck</u>'s Inconsistent-Factual-Allegations Rule Prevents Plaintiffs From Relitigating the Issues of Whether the Officers Had a Lawful Basis to Detain Wilkerson and Whether Wilkerson Resisted Handcuffing

Based on <u>Heck</u>'s inconsistent-factual-allegations rule, the Court must find that

Wilkerson fled from a lawful detention and physically resisted handcuffing.  (Doc.

48 at 7-9, ¶¶ 33-44.)   A plaintiff may "voluntarily steer[ ] the action into <u>Heck</u>

territory by making specific factual allegations in the complaint that [are]

inconsistent with the facts upon which his criminal convictions were based."

<u>McCann v. Neilsen</u>, 466 F.3d 619, 621 (7th Cir. 2006).  "[A] plaintiff's claim is

<u>Heck</u>-barred *despite its theoretical compatibility with his underlying conviction* if

specific factual allegations in the complaint are necessarily inconsistent with the

validity of the conviction."  <u>McCann v. Neilsen</u>, 466 F.3d 619, 621 (7th Cir. 2006)

(emphasis added).  "The question for us, then, is not whether [the plaintiff] *could have* drafted a complaint that steers clear of <u>Heck</u> (he could have), but whether he did.  In other words, does the complaint contain factual allegations that 'necessarily imply' the invalidity of his convictions."  <u>McCann v. Neilsen</u>, 466 F.3d 619, 622 (7th Cir. 2006).  "It is irrelevant that he disclaims any intention of challenging his conviction; if he makes allegations that are inconsistent with the conviction's having been valid, <u>Heck</u> kicks in and bars his civil suit."  <u>Okoro v. Callaghan</u>, 324 F.3d 488, 490 (7th Cir. 2003).

The Eleventh Circuit has adopted the inconsistent-factual-allegation rule.  <u>See</u> <u>Dixon v. Hodges</u>, 887 F.3d 1235, 1238 (11th Cir. 2018) ("We have recognized that, in some cases, <u>Heck</u> may bar a prisoner's suit 'if his § 1983 complaint makes specific factual allegations that are inconsistent with the facts upon which his [criminal convictions were] based.'  This footnote in <u>Dyer</u> . . . is a recitation of the inconsistent-factual-allegations rule from <u>McCann v. Neilsen</u>, 466 F.3d 619 (7th Cir. 2006)." (quoting <u>Dyer v. Lee</u>, 488 F.3d 876, 884 n.9 (11th Cir. 2007)).  "To the extent we adopted the inconsistent-factual-allegation gloss on <u>Heck</u> in our <u>Dyer</u> decision, we agree with the Seventh Circuit that it is only apposite in the narrow category of cases . . . where the allegation in the § 1983 complaint is a specific one that both necessarily implies the earlier decision is invalid *and* is necessary to the success of the § 1983 suit itself.  The "logical necessity" of conflict between the

[criminal conviction] and the § 1983 suit, itself 'at the heart of the <u>Heck</u> opinion,' is present only in these circumstances." <u>Dixon v. Hodges</u>, 887 F.3d 1235, 1239 (11th Cir. 2018).

The Complaint's allegation that the officers "had no reasonably trustworthy information that would cause any [officer] to believe, under the circumstances, that [Wilkerson] had committed, was committing, or was about to commit any criminal offense," (Doc. 48 at 5, ¶ 19), voluntarily steered Wilkerson's § 1983 false arrest claim into <u>Heck</u> territory.  (Doc. 48 at 7, ¶¶ 29-32.)  The state court's judgment that Wilkerson was guilty of resisting arrest necessarily determined that the officers had probable cause to believe Wilkerson committed a criminal offense.  <u>See</u> <u>Rogers v. City of Selma</u>, 178 F. Supp. 3d 1222, 1246 (S.D. Ala. 2016) ("In Alabama, probable cause must exist to make a lawful arrest."); <u>Summers v. Martin</u>, No. CV-12-S-1816-NE, 2013 WL 6499366, at *10 (N.D. Ala. Dec. 11, 2013) ("a lawful arrest is the prerequisite for the crime of resisting arrest").

The Complaint's allegation that Wilkerson "in no way actively resisted or attempted to resist his arrest," (Doc. 48 at 5, ¶ 21), also voluntarily steered Wilkerson's § 1983 excessive force claim and both state law claims into <u>Heck</u> territory.  (Doc. 48 at 7-9, ¶¶ 33-44.)  The body camera videos prove no officer used force against Wilkerson after both hands were handcuffed.  (Exs. 2-5.)  By process of elimination, the Complaint's use-of-force claims could only be based upon actions

the officers took before the second handcuff was applied.  And the Complaint's allegation that the use of force was unjustified because Wilkerson did not resist at all directly contradicts the state court's judgment.  (Doc. 48 at 5, ¶ 21.)  Thus, not only does the Complaint's allegation that Wilkerson did not resist arrest at all necessarily imply that the state court's judgment is invalid, but that allegation is also the entire basis for the § 1983 excessive force and state law claims.

The Complaint predicates its use-of-force claims on the factual assertion that Wilkerson did not resist arrest at all.  (Doc. 48 at 5, ¶ 21.)  By voluntarily steering the Complaint into Heck territory, Plaintiffs have deprived the court of jurisdiction to entertain their claims, even if Plaintiffs theoretically could have pled claims that would not run afoul of Heck.  See McCann v. Neilsen, 466 F.3d 619, 621 (7th Cir. 2006) ("a plaintiff's claim is Heck-barred despite its theoretical compatibility with his underlying conviction if specific factual allegations in the complaint are necessarily inconsistent with the validity of the conviction").  Based on Heck, the Court cannot entertain any of Plaintiffs' claims because all of the claims necessarily imply that Wilkerson's adjudication of delinquency is invalid.

## C.   The Doctrine of Collateral Estoppel Precludes Plaintiffs from Relitigating Issues of Fact or Law That the State Court Necessarily Decided Against Wilkerson

The doctrine of collateral estoppel precludes Plaintiffs from relitigating issues of fact or law that the state court necessarily decided in the adjudication of

delinquency.  "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 414 (1980).  "As [the Supreme Court] and other courts have often recognized, . . . collateral estoppel relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication."  Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 415 (1980).

The doctrine of collateral estoppel may arise from judgments entered in criminal proceedings.  See Allen v. McCurry, 449 U.S. 90, 104, 101 S. Ct. 411, 420 (1980) ("And nothing in the legislative history of § 1983 reveals any purpose to afford less deference to judgments in state criminal proceedings than to those in state civil proceedings.").  Collateral estoppel may arise from judgments entered in juvenile delinquency proceedings.  See M.D. ex rel. Daniels v. Smith, 504 F. Supp. 2d 1238, 1251 (M.D. Ala. 2007) (Thompson, J.) (applying doctrine of collateral estoppel to juvenile delinquency proceeding).  "The rules of collateral estoppel apply with full force to civil rights actions arising under 42 U.S.C. § 1983."  Vazquez v. Metropolitan Dade Cty., 968 F.2d 1101, 1106 (11th Cir. 1992).  Federal law requires the court to give full faith and credit to the state court's judgment.  See 28 U.S.C.A. § 1738 (Westlaw 2021) ("Such Acts, records and judicial proceedings or copies

thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.").

In its order taking judicial notice of Wilkerson's state court adjudication of delinquency, the court cautioned that "taking judicial notice of the fact of relevant proceedings does not make the facts found in such proceedings binding on the court." (Doc. 47 at 3, ¶ 2.)  However, a judgment of which the court has taken judicial notice may, as in this case, activate the doctrine of collateral estoppel. Indeed, the doctrine of "collateral estoppel may be raised in a motion to dismiss when the elements are apparent on the face of the pleadings and there are public documents of which the court may take judicial notice."  Hamze v. Steel, No. 12-61356-CIV, 2014 WL 12640242, at *3 (S.D. Fla. Aug. 18, 2014), report and recommendation adopted sub nom. Hamze v. Cummings, No. 12-62356-CIV, 2014 WL 12640243 (S.D. Fla. Sept. 30, 2014).

"In examining a motion to dismiss based on collateral estoppel . . . , a court may take judicial notice of the record in the prior case without converting the motion to a motion for summary judgment."  SMK Assocs., LLC v. Lorali, Inc., No. 14-CV-61460, 2015 WL 11197776, at *3 (S.D. Fla. Jan. 21, 2015).  Thus, "in considering Defendant[s'] . . . collateral estoppel arguments, the Court may take

judicial notice of the filings in [Wilkerson's] prior case[ ] as [a] public record[ ], without converting the current motion to dismiss under Rule 12(b)(6) to a motion for summary judgment under Rule 56." West v. Wells Fargo Bank, N.A., No. 116CV00393WSDAJB, 2017 WL 9474220, at *1 n.1 (N.D. Ga. Jan. 4, 2017), report and recommendation adopted, No. 1:16-CV-393-WSD, 2017 WL 382615 (N.D. Ga. Jan. 27, 2017).

Because Wilkerson's juvenile delinquency adjudication occurred in state court, state law determines its preclusive effect. See Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81, 104 S. Ct. 892, 896 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."). The United States Court of Appeals for the Eleventh Circuit has determined that Alabama's doctrine of collateral estoppel precludes a § 1983 plaintiff from relitigating issues that were decided against that plaintiff in a state court proceeding. In Wood v. Kesler, 323 F.3d 872, 879 (11th Cir. 2003), the Eleventh Circuit that held a § 1983 plaintiff who was convicted of speeding was collaterally estopped from relitigating the fact he was traveling seventeen miles-per-hour over the speed limit. In Hunter v. City of Leeds, 941 F.3d 1265, 1276 (11th Cir. 2019), the Eleventh Circuit held that a § 1983 plaintiff's guilty plea to a charge

of menacing collaterally estopped him from relitigating the fact that he pointed a gun at the defendant police officer.

Police officers are entitled to invoke collateral estoppel.  See Wood v. Kesler, 323 F.3d 872, 880 n.10 (11th Cir. 2003) (holding arresting officer entitled to invoke collateral estoppel).  Under Alabama law, "[t]he elements of collateral estoppel are: (1) an issue identical to the one litigated in the prior suit; (2) that the issue was actually litigated in the prior suit; (3) that resolution of the issue was necessary to the prior judgment; and (4) the same parties."  Dairyland Ins. Co. v. Jackson, 566 So. 2d 723, 726 (Ala. 1990).  "The 'same-parties' prong may be satisfied if the party seeking the benefit of collateral estoppel is in privity with the party in the first suit, and the party to be estopped is bound by the previous judgment – i.e., was a party to the previous suit."  Hunter v. City of Leeds, 941 F.3d 1265, 1274 (11th Cir. 2019). "Alabama's expansive definition of privity 'includes not only a successive interest to the same property right, but also an identity of interest in the subject matter of [the] litigation.'"  Id. at 1274 (quoting Wood v. Kesler, 323 F.3d 872, 880 n.10 (11th Cir. 2003)).  "Here, [as in Hunter v. City of Leeds,] the defendant officers were not parties to the criminal proceeding against [Wilkerson] in state court . . . .  However, . . . the officers shared an 'identity of interest' with the State, and thus are in privity with the State for purposes of this suit."  Hunter, 941 F.3d 1265 at 1274-75.  "Under these circumstances, where the events that form the basis of each case are identical,

the officers and the State share an identity of interest in the allocation of rights and liabilities arising from that single episode." <u>Hunter</u>, 941 F.3d at 1275. "The officers were acting for the State during the pursuit and apprehension that resulted in [Wilkerson's] prosecution, and they share an interest with the State in ensuring that [Wilkerson] is held responsible for his actions during that encounter." <u>Id.</u> "Thus, the same-parties requirement is satisfied." <u>Id.</u>

The Alabama Court of Criminal Appeals opinion of which the court has taken judicial notice states that Wilkerson was charged with obstructing governmental operations in violation of Alabama Code § 13A-10-2(a) and resisting arrest in violation of Alabama Code § 13A-10-41. (Ex. 1 at 1.) Wilkerson was adjudicated delinquent for both offenses. (Ex. 1 at 1.) The adjudication of delinquency was affirmed on appeal. (Ex. 1 at 9.) Thus, the adjudication of delinquency collaterally estops Wilkerson from relitigating factual and legal issues that were necessarily decided against him in that proceeding. <u>See</u> <u>Hunter</u>, 941 F.3d at 1276 ("Thus, the basis for Hunter's guilty plea to menacing necessarily was his pointing a pistol at Kirk, and by pleading guilty Hunter has admitted to pointing his pistol at Kirk. Hunter is estopped from now claiming that he did not do so.")

The doctrine of collateral estoppel also precludes Wilkerson's mother, plaintiff Angela Williams, from relitigating issues that were decided against Wilkerson in the juvenile delinquency proceeding. The Alabama Supreme Court

30

has "recognized that the doctrine of mutuality of estoppel may be satisfied by less than a perfect identity of the parties in the first and second actions, as when particular parties are in privity." Ex parte Flexible Prod. Co., 915 So. 2d 34, 48 (Ala. 2005). "Privity is a 'flexible' term that generally applies when one person has the 'same interests' as another." Holley v. Town of Camp Hill, 351 F. Supp. 3d 1359, 1365 (M.D. Ala. 2018) (quoting Jim Parker Bldg. Co. v. G & S Glass & Supply Co., 69 So. 3d 124, 132 (Ala. 2011)). "The test for determining if two parties are in privity focuses on identity of interest." Dairyland Ins. Co. v. Jackson, 566 So. 2d 723, 726 (Ala. 1990).

"Privity is often deemed . . . to arise from '(1) the relationship of one who is privy in blood, estate, or law; (2) the mutual or successive relationship to the same rights of property; [or] (3) an identity of interest in the subject matter of litigation.'" Leon C. Baker, P.C. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 821 So. 2d 158, 165 (Ala. 2001) (quoting Hughes v. Martin, 533 So. 2d 188, 191 (Ala. 1988)). Williams and Wilkerson are privy by blood. (Doc. 48 at 9, ¶ 43.) They also share an identity of interest because Williams's claim is derivative of Wilkerson's. See Smith v. Richardson, 171 So. 2d 96, 97 (1965) (holding "[the father's] claim for damages was dependent upon negligence on the part of [the defendant] toward [the minor child]"). Accordingly, the doctrine of collateral estoppel precludes both plaintiffs from relitigating issues necessarily decided during Wilkerson's state court

31

delinquency proceeding.  The following sections apply the doctrine of collateral estoppel to Wilkerson's § 1983 claims.

## D. All Officers Are Entitled to Qualified Immunity Against Wilkerson's § 1983 False Arrest Claim

All officers are entitled to qualified immunity against Wilkerson's § 1983 false arrest claim.  (Doc. 48 at 7, ¶¶ 29-32.)  "'False arrest' is shorthand for an unreasonable seizure prohibited by the Fourth Amendment." Gonzalez v. Village of W. Milwaukee, 671 F.3d 649, 655 (7th Cir. 2012).  "One of the Amendment's protections is the right to be free from arrest without probable cause." Barnett v. MacArthur, 956 F.3d 1291, 1296 (11th Cir. 2020).  "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010).  "An arrest does not violate the Fourth Amendment if a police officer has probable cause for the arrest." Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003).

"Even if an officer has effected an arrest without probable cause (and without a warrant), he still will be entitled to qualified immunity if the arrest was supported by *arguable* probable cause." Fish v. Brown, 838 F.3d 1153, 1167 (11th Cir. 2016). "The standard for arguable probable cause is whether a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question

*could* have reasonably believed that probable cause existed in the light of well-established law." Eubanks v. Gerwen, 40 F.3d 1157, 1160 (11th Cir. 1994). Wilkerson has the burden to show the absence of arguable probable cause for his arrest. See Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003) ("Once the defendants have established that they were acting within their discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate.").

The adjudication of delinquency for obstructing governmental operations and resisting arrest conclusively establishes the lawfulness of Wilkerson's arrest. According to Alabama Code § 13A-10-41(a), "A person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from [e]ffecting a *lawful arrest* of himself or of another person." (Emphasis added.) One of the elements of resisting arrest is a "lawful arrest." Ala. Code § 13A-10-41(a) (1975). A resisting arrest conviction cannot stand if the underlying arrest was unlawful. See Ford v. State, 680 So. 2d 948, 951 (Ala. Crim. App. 1995) ("The appellant's conviction for resisting arrest is due to be reversed because his arrest for possession of cocaine was unlawful."); R.I.T. v. State, 675 So. 2d 97, 100 (Ala. Crim. App. 1995) ("the appellant's conviction for resisting arrest is due to be reversed because his arrest for disorderly conduct was unlawful").

33

The state court's determination that Wilkerson's arrest was lawful necessarily decided that the arrest was supported by probable cause.  See Franklin v. City of Huntsville, 670 So. 2d 848, 852 (Ala. 1995) ("probable cause must exist to make a lawful arrest").   "The existence of probable cause at the time of arrest . . . constitutes an absolute bar to a section 1983 action for false arrest."  Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004).  "Alabama's standard for the existence of probable cause is the same as the federal standard."  Rogers v. City of Selma, 178 F. Supp. 3d 1222, 1246 (S.D. Ala. 2016).  Accordingly, the state court's adjudication of delinquency prevents Plaintiffs from relitigating the lawfulness of Wilkerson's arrest.

"In this Circuit, the use of a criminal conviction as conclusive of an issue in subsequent civil litigation is well-established."  Parris v. Town of Alexander City, 45 F. Supp. 2d 1295, 1300 (M.D. Ala. 1999).  In Styron v. City of Foley, the United States District Court for the Southern District of Alabama held that convictions for obstructing governmental operations and resisting arrest precluded the plaintiffs from relitigating the lawfulness of their arrests:

> Plaintiffs were both convicted of obstructing governmental operations, resisting arrest, and assault in the third degree with regard to the incident in question.  Thus, it has been conclusively established as necessary elements of plaintiffs' convictions that they intentionally obstructed, impaired, or hindered the administration of law or an activity which a public servant was legally authorized to undertake on behalf of a government.   It is also conclusively determined that

> plaintiffs intentionally attempted to prevent a peace officer from effecting a lawful arrest of himself or another person. . . .
>
> As such, the court agrees that plaintiffs are precluded from asserting that their arrests or imprisonments were unlawful . . . .

Styron v. City of Foley, No. CIV.A. 03-0572-CG-L, 2005 WL 3098926, at *5 (S.D. Ala. Nov. 18, 2005). Based on the foregoing, the doctrine of collateral estoppel precludes Plaintiffs from relitigating the lawfulness of Wilkerson's arrest. See Manning v. Moore, No. 1:10-CV-925-MEF, 2012 WL 3879281, at *9 (M.D. Ala. Sept. 6, 2012) ("for both resisting arrest and obstructing governmental operations, the arrest or governmental operation, respectively, must be lawfully undertaken by the police officer or government agent").

"Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 816 (2009). Because Wilkerson was lawfully arrested, the officers did not violate a clearly established Fourth Amendment right against false arrest. The Court should grant all officers qualified immunity against Wilkerson's § 1983 false arrest claim.

### E.   All Officers Are Entitled to Qualified Immunity Against Wilkerson's § 1983 Excessive Force Claim

All officers are also entitled to qualified immunity against Wilkerson's § 1983 excessive force claim. (Doc. 48 at 7-8, ¶¶ 33-36.) "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the

Fourth Amendment right against unreasonable seizures." Tolan v. Cotton, 572 U.S. 650, 565, 134 S. Ct. 1861, 1865 (2014). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 1699 (1985)). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir. 1973)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872 (1989). "We must look at the situation not with hindsight, but with the eye of the objectively reasonable officer on the scene." Garrett v. Athens-Clarke Cty., 378 F.3d 1274, 1281 (11th Cir. 2004).

### 1.   Plaintiffs Cannot Relitigate the Manner in Which Wilkerson Obstructed Governmental Operations and Resisted Arrest

Although the doctrine of collateral estoppel may not summarily bar Wilkerson's excessive force and assault and battery claims and Williams's

derivative state law claim for Wilkerson's alleged injuries, it does limit what facts the court must assume to be true when the court decides the motion to dismiss. See Willingham v. Loughnan, 261 F.3d 1178, 1183 (11th Cir. 2001) ("the doctrine of issue preclusion does operate to limit what facts we can accept were found by the jury in this civil case for the qualified-immunity decision"), cert. granted, judgment vacated on other grounds, 537 U.S. 801, 123 S. Ct. 68 (2002); M.D. ex rel. Daniels v. Smith, 504 F. Supp. 2d 1238, 1252 (M.D. Ala. 2007) (Thompson, J.) ("In other words, even if collateral estoppel does not bar a § 1983 suit, it may limit what facts a § 1983 plaintiff can dispute on defendant's motion for summary judgment based on qualified immunity.").

The doctrine of collateral estoppel applies even when the verdict in the state court proceeding was a general verdict and specific findings of fact are not available. See Willingham v. Loughnan, 261 F.3d 1178, 1183 (11th Cir. 2001) ("Because the verdicts in both the criminal-trial and in this case are general verdicts, the specific facts found by the juries are not available to us."), cert. granted, judgment vacated on other grounds, 537 U.S. 801, 123 S. Ct. 68 (2002).  In such circumstances, the court must review the record and determine what the finder of fact must have concluded to reach its decision in the earlier case. See Willingham, 261 F.3d at 1185 ("Based on our review of the record from the criminal trial, we conclude that the jury in the earlier criminal case must have concluded . . . ."); see also Hunter v. City

37

of Leeds, 941 F.3d 1265, 1275 (11th Cir. 2019) (holding court must examine "plea colloquy or other record evidence establishing the 'physical action' taken by [the plaintiff]"). So identified, those facts must be "taken as true and final." Willingham, 261 F.3d at 1185.

Resisting arrest requires an act by the offender intended to prevent or attempt to prevent an arrest. See Ala. Code § 13A-10-41(a) (1975) ("A person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting [sic] a lawful arrest of himself or of another person."). The court must examine the record evidence to identify the "physical action taken by [Wilkerson]" to resist arrest. Hunter v. City of Leeds, 941 F.3d 1265, 1275 (11th Cir. 2019) (holding the court must examine the "plea colloquy or other record evidence establishing the 'physical action' taken by [the plaintiff]"). Those facts must be "taken as true and final." Willingham, 261 F.3d at 1185.

The record evidence shows that Wilkerson committed the offense of resisting arrest by physically struggling to prevent the officers from applying the second handcuff to his left arm. (Ex. 1 at 1-4.) According to Officer Kirkland, officers were "struggling with [Wilkerson] in an attempt to place a handcuff on [Wilkerson's] left arm." (Ex. 1 at 4, ¶ 3.) Wilkerson "kept placing his arm under himself so that the officers could not get his arm." (Ex. 1 at 4, ¶ 3.) According to Officer Watts, Wilkerson "had his left hand underneath his body and kept trying to pull away from

Sgt. Rodgers in what Officer Watts believed could have been an attempt to 'try to grab something,' but . . . it was also an 'attempt to keep from being detained at that time.'"  (Ex. 1 at 4, ¶ 4.)  According to Sgt. Rodgers, Wilkerson "was jerking, pulling, and doing everything he could to get away from Sgt. Rodgers's grasp."  (Ex. 1 at 3, ¶ 1.)  "Sgt. Rodgers perceived [Wilkerson] to be trying to reach underneath his body."  (Ex. 1 at 3, ¶ 2.)  Sgt. Hicks "issued[d] verbal commands for [Wilkerson] to stop resisting, and eventually issued four or five 'jabs' to [Wilkerson's] face in an attempt to get [Wilkerson] to relent."  (Ex. 1 at 3, ¶ 2.)  Eventually, Officer Watts "was able to reach 'into the pile' and place the handcuff on [Wilkerson's] left arm."  (Ex. 1 at 4, ¶ 4.)  "Once the handcuffs were on [Wilkerson], the officers got off [Wilkerson], rolled him over to his back, and helped him sit up."  (Ex. 1 at 3, ¶ 3.)

By logical necessity, Wilkerson's resistance during handcuffing was the only conduct that could have supported the adjudication of delinquency for resisting arrest.  Wilkerson's flight could not have.  Obstructing governmental operations requires a physical act.  See D.A.D.O. v. State, 57 So. 3d 798, 806 (Ala. Crim. App. 2009) ("We hold that § 13A-10-2 does require that the interference be *physical* interference and that words alone fail to provide culpability under § 13A-10-2. Under the express provisions of the statute, the interference would have to be, in part at least, physical in nature.").  Based on the record, Wilkerson's flight was the only physical act that logically could have provided the basis for Wilkerson's

adjudication of delinquency for obstructing governmental operations.  (Ex. 1 at 3.)  The flight was what prevented Sgt. Rodgers and Officer Barron from completing a field contact card.  (Ex. 1 at 3.)  Under Alabama law, the same conduct cannot simultaneously support the offenses of obstructing governmental operations and resisting arrest.  By its own terms, Alabama's obstructing governmental operations statute "*does not apply* to the obstruction, impairment or hindrance of *the making of an arrest*."  Ala. Code § 13A-10-2(b) (1975) (emphasis added).

Because the adjudication of delinquency for obstructing governmental operations necessarily was based upon Wilkerson's flight, that flight could not also have supported the resisting arrest charge without violating section 13A-10-2(b).  See Grider v. City of Auburn, 618 F.3d 1240, 1258 (11th Cir. 2010) ("Alabama's obstruction offense does not apply to 'the obstruction, impairment or hindrance of the making of an arrest.'") (quoting Ala. Code § 13A-10-2(b) (1975)).  By process of elimination, the state court's finding that Wilkerson also committed the offense of resisting arrest "*necessarily* decided" that Wilkerson engaged in some conduct in addition to flight (i.e., something in addition to the conduct that constituted obstructing governmental operations) that amounted to resisting arrest.  Hunter v. City of Leeds, 941 F.3d 1265, 1276 (11th Cir. 2019).  When the flight that constituted obstructing governmental operations is eliminated by virtue of section 13A-10-2(b), the adjudication of delinquency for resisting arrest could only have

been based on Wilkerson's resistance during handcuffing.  See Manning v. Moore, No. 1:10-CV-925-MEF, 2012 WL 3879281, at *9 (M.D. Ala. Sept. 6, 2012) ("Because resisting arrest itself is exempt from the crime of obstructing governmental operations, § 13A-10-2(b) ('This section does not apply to the obstruction, impairment or hindrance of the making of an arrest'), Plaintiff's obstruction of governmental operations arrest, by process of elimination, could only relate to Detective Mason's impersonation of a peace officer investigation.").

By logical necessity, the adjudication of delinquency conclusively establishes that Wilkerson actively resisted handcuffing and collaterally estops Plaintiffs from relitigating that fact.  See Ashe v. Swenson, 397 U.S. 436, 443, 90 S. Ct. 1189, 1194 (1970) ("'Collateral estoppel' . . . means . . . that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.").  Based on the doctrine of collateral estoppel, the court must give full faith and credit to the state court's determination that Wilkerson resisted handcuffing.

### 2.   The Officers Did Not Violate Wilkerson's Fourth Amendment Right Against Excessive Force

The Complaint does not depict a violation of the Fourth Amendment right against excessive force.  "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' . . . its proper application requires careful attention to the facts and circumstances of each

particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989) (quoting Bell v. Wolfish, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884 (1979)). "These three factors serve only as a guide, and it is not necessary in all cases for an officer to show that all three factors weigh in his or her favor to establish that the force ultimately used was reasonably proportionate to the need for force." Varnadore v. Merritt, 778 F. App'x 808, 813-144 (11th Cir. 2019).

Regarding the severity-of-the-crime prong, "this first Graham factor is intended as a proxy for determining whether 'an officer had any reason to believe that the subject of a seizure was a potentially dangerous individual.'" Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst, 810 F.3d 892, 900 (4th Cir. 2016) (quoting Smith v. Ray, 781 F.3d 95, 102 (4th Cir. 2015)). In this case, the use of force occurred during an arrest for obstructing governmental operations. (Ex. 1 at 1.) The arrest occurred during the officers' investigation of a rash of vehicle break-ins and auto thefts. (Ex. 1 at 1-2.) The events occurred around midnight after Wilkerson, dressed in dark clothing, emerged from behind a closed business and fled from the police. (Ex. 1 at 2.) Under these circumstances, a reasonable officer could have believed Wilkerson was involved in a felony offense. See Ala. Code § 13A-7-

42

7(b) (declaring burglary a felony offense); Ala. Code § 13A-8-3(b) (declaring auto

theft a felony offense); Ala. Code § 13A-8-11(b) (declaring breaking and entering a

vehicle a felony offense).  Accordingly, the first <u>Graham</u> factor favors the officers.[6]

"The second <u>Graham</u> factor is whether the suspect posed a threat."  <u>Huntley</u>

<u>v. City of Owasso</u>, 497 F. App'x 826, 830 (10th Cir. 2012).  In evaluating this factor,

the court must disregard Plaintiffs' conclusory allegations that Wilkerson "in no way

actively resisted or attempted to resist his arrest." (Doc. 48 at 5, ¶ 21.)  The Eleventh

Circuit "has consistently held that conclusory allegations without specific supporting

facts have no probative value."  <u>Evers v. General Motors Corp.</u>, 770 F.2d 984, 986

(11th Cir. 1985).  "Conclusory allegations are those which express 'a factual

inference without stating the underlying facts on which the inference is based.'"

<u>Massey v. Connor</u>, No. 2:15CV739-MHT, 2019 WL 3526492, at *1 (M.D. Ala. Aug.

2, 2019) (Thompson, J.) (quoting *Conclusory*, Black's Law Dictionary (11th ed.

2019)).  "We identify conclusory allegations and then discard them – not 'on the

ground that they are unrealistic or nonsensical' but because their conclusory nature

'disentitles them to the presumption of truth.'"  <u>McCullough v. Finley</u>, 907 F.3d

1324, 1333 (11th Cir. 2018) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 681, 129 S.

Ct. 1937, 1951 (2009)).  This rule applies to conclusory allegations that a plaintiff

---

[6] "Of course, the use of force can be reasonable, even when the crime at issue is innocuous."
<u>Thomas v. Plummer</u>, 489 F. App'x 116, 126 (6th Cir. 2012).

43

did not resist arrest.  See Leibovitz v. City of New York, No. 14-CV-7106(KAM)(LB), 2018 WL 1157872, at *15 (E.D.N.Y. Mar. 2, 2018) (characterizing plaintiff's allegation that he "did not resist the arrest" as "a conclusory statement" and declaring "[these] allegations are precisely the kind of 'unadorned, the-defendant-unlawfully-harmed-me accusation[s]' and 'naked assertions devoid of further factual enhancement' that the Supreme Court has concluded will not suffice to state a claim").  This rule also applies to conclusory allegations that no threat existed.  See Corbitt v. Vickers, 929 F.3d 1304, 1322 n.18 (11th Cir. 2019) ("we discount the complaint's allegation [that the dog was non-threatening when the officer discharged his weapon] because it is conclusory.  There are no allegations of actual fact indicating that the dog was non-threatening"); Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1355 (11th Cir. 2015) ("Mobley now contends that he posed no threat, but he does not point to any facts that would have made it objectively unreasonable for the officers to believe that he did.").

Plaintiffs also allege Wilkerson "was not armed," (Doc. 48 at 5, ¶ 18), but the officers could not have known that.  The officers could not determine whether Wilkerson was armed because he did not give them an opportunity to pat him down. See Williams v. City of Dothan, No. 1:14-CV-287-WHA, 2015 WL 4635264, at *5 (M.D. Ala. Aug. 3, 2015) ("the Defendants did not have any way to determine

whether the Plaintiff had a firearm because they did not have a chance to pat him down under the circumstances"); MacLeod v. Town of Brattleboro, No. 5:10-CV-286, 2012 WL 1928656, at *6 (D. Vt. May 25, 2012) ("the officers did not have an opportunity to search Plaintiff . . . and thus it was unknown if Plaintiff was armed or whether a weapon or weapons were within reach"). "[W]hat counts for qualified immunity purposes . . . is the information known to the defendant officers . . . at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." Jones v. Cannon, 174 F.3d 1271, 1283 (11th Cir. 1999).

Setting aside the Complaint's conclusory allegations, and allegations about things the officers could not have known, the officers reasonably could have believed Wilkerson posed a serious threat to their safety. Wilkerson fled "for several blocks." (Doc. 48 at 5, ¶ 17.) Based on Wilkerson's prolonged flight, the officers reasonably could have believed he presented a heightened threat. See Strepka v. Jonsgaard, No. 10-CV-00320-RBJ-KMT, 2011 WL 5569493, at *5 (D. Colo. Nov. 16, 2011) ("[I]it is clear from the record that [the officer] believed that the plaintiff was attempting to evade by flight. . . . It is reasonable for an officer to perceive a heightened threat when a suspect refuses to comply.")

When the officers caught Wilkerson and tried to handcuff him, Wilkerson resisted arrest. (Ex. 1.) The adjudication of delinquency necessarily establishes that Wilkerson committed the offense of resisting arrest by physically struggling to

45

prevent the officers from applying the second handcuff to his left arm.  (Ex. 1 at 1-4.)  The court must examine the available record, determine what the state court must have concluded, and take those facts as "true and final."  Willingham v. Loughnan, 261 F.3d 1178, 1185 (11th Cir. 2001), cert. granted, judgment vacated on other grounds, 537 U.S. 801, 123 S. Ct. 68 (2002).

The state court summarized the pertinent facts as follows.  According to Officer Kirkland, officers were "struggling with [Wilkerson] in an attempt to place a handcuff on [Wilkerson's] left arm."  (Ex. 1 at 4, ¶ 3.)  Wilkerson "kept placing his arm under himself so that the officers could not get his arm."  (Ex. 1 at 4, ¶ 3.)  According to Officer Watts, Wilkerson "had his left hand underneath his body and kept trying to pull away from Sgt. Rodgers in what Officer Watts believed could have been an attempt to 'try to grab something,' but . . . it was also an 'attempt to keep from being detained at that time.'"  (Ex. 1 at 4, ¶ 4.)  According to Sgt. Rodgers, Wilkerson "was jerking, pulling, and doing everything he could to get away from Sgt. Rodgers's grasp."  (Ex. 1 at 3, ¶ 1.)  "Sgt. Rodgers perceived [Wilkerson] to be trying to reach underneath his body."  (Ex. 1 at 3, ¶ 2.)  The officers reasonably could have interpreted Wilkerson's failure to present his unsecured hand as intentional resistance.  See Baker v. Clements, 760 F. App'x 954, 958 (11th Cir. 2019) ("it was reasonable for Defendant Officers to perceive Plaintiff's failure to present his right hand to be handcuffed as a sign of intentional resistance").

46

"Law enforcement officers may use physical force to subdue an arrestee when he fails to comply with orders to lie still during handcuffing." Carpenter v. Gage, 686 F.3d 644, 649 (8th Cir. 2012).  Sgt. Hicks "issued[d] verbal commands for [Wilkerson] to stop resisting, and eventually issued four or five 'jabs' to [Wilkerson's] face in an attempt to get [Wilkerson] to relent."  (Ex. 1 at 3, ¶ 2.) Eventually, Officer Watts "was able to reach 'into the pile' and place the handcuff on [Wilkerson's] left arm."  (Ex. 1 at 4, ¶ 4.)  "Once the handcuffs were on [Wilkerson], the officers got off [Wilkerson], rolled him over to his back, and helped him sit up." (Ex. 1 at 3, ¶ 3.)  The body camera videos prove no force was used after Wilkerson was handcuffed.  (Exs. 2-5.)

When Wilkerson resisted handcuffing, the officers reasonably could have believed he was reaching for a gun.  See Murphy v. Demings, 626 F. App'x 836, 840 (11th Cir. 2015) ("When Plaintiff made a sudden movement toward his waistband, an objective officer in Deputy Caron's situation could have believed reasonably that Plaintiff was reaching for a gun and that Plaintiff posed an imminent threat of serious physical injury to the officers and to others."); United States v. Dykes, 406 F.3d 717, 720 (D.C. Cir. 2005) ("Dykes had kept his hands near his waistband, resisting both the officers' commands and their physical efforts to move his hands into plain view.  Under these circumstances, it was reasonable for the

officers to fear that Dykes had a weapon in his waistband, and to take the necessary steps to ensure that he could not use it.").

The videos prove that Wilkerson was only partially handcuffed when force was used. (Exs. 2-5.) In his partially handcuffed state, Wilkerson posed a threat to strike the officers with the loose handcuff. See Hoyt v. Cooks, 672 F.3d 972, 979 (11th Cir. 2012) ("Allen continued to pose a danger during the time when only one of his hands was handcuffed; without both hands shackled, the single handcuff could be used as a weapon."); Zubrod v. Hoch, 907 F.3d 568, 571 (8th Cir. 2018) ("handcuffs secured on only one wrist can be used as a weapon"); Wilson v. Ferguson, No. CV 18-00205-KD-B, 2019 WL 1301973, at *8 (S.D. Ala. Mar. 21, 2019) ("Wilson's unsecured right wrist posed a threat to officer safety."). For all these reasons, the second Graham factor favors the officers.

"The third Graham factor is whether the suspect resisted arrest." Huntley v. City of Owasso, 497 F. App'x 826, 831 (10th Cir. 2012). "When an arrestee flees or resists, some use of force by the police is reasonable." Greiner v. City of Champlin, 27 F.3d 1346, 1355 (8th Cir. 1994). Wilkerson fled, resisted handcuffing, and employed active measures to counter the officers' alleged strikes. (Ex. 1 at 3-4; Doc. 48 at 6, ¶ 28.) The third Graham factor also favors the officers.

"In the Eleventh Circuit, we recognize that the typical arrest involves some force and injury." Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002). "A

law enforcement officer's right to arrest necessarily carries with it the ability to use some force in making the arrest." Brown v. City of Huntsville, 608 F.3d 724, 740 (11th Cir. 2010). Indeed, "the use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002).

In response to Wilkerson's resistance, "one or more of" the officers allegedly threw Wilkerson to the ground and employed strikes and kicks. (Doc. 48 at 5-6, ¶ 23.) The officers were entitled to take Wilkerson to the ground to arrest his flight. See Parrish v. Dingman, 912 F.3d 464, 468 (8th Cir. 2019) ("To restrain and handcuff him, Dingman forced him into the wall and leveraged him to the ground. This is a common technique to restrain individuals and was proportional to the need for force."); Avery v. Davis, 700 F. App'x 949, 953 n.4 (11th Cir. 2017) ("Davis' actions after arresting Avery, such as bringing Avery back to the ground and holding Avery down with his knee, were justified because Avery admits that he was attempting to stand up while being arrested. Those actions were not excessive force."). Indeed, taking a suspect to the ground is considered *de minimis* force in this Circuit. See Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003) ("Here, even if the force applied by Pastor in effecting the arrest – forcing Durruthy down to the ground and placing him in handcuffs – was unnecessary, plainly it was not unlawful. The amount of force used was *de minimus*.").

The officers also did not use excessive force by allegedly employing strikes and kicks to subdue Wilkerson.  For one thing, the Complaint's allegation about "beating and kicking," (Doc. 48 at 6, ¶ 23), is conclusory as a matter of law.  See Teal v. Campbell, 603 Fed. App'x 820, 823 (11th Cir. 2015) (characterizing the phrase "stomped and kicked numerous times" as "conclusory allegations . . . with respect to the amount of force applied").  "[A] count supported only by conclusory allegations necessarily fails to state a claim."  L.S. ex rel. Hernandez v. Peterson, 982 F.3d 1323, 1330 (11th Cir. 2020).

In any event, "force applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive."  Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1356 (11th Cir. 2015).  In Hinson v. Bias, 927 F.3d 1103, 1120-21 (11th Cir. 2019), the Eleventh Circuit held officers did not violate a suspect's Fourth Amendment right against excessive force by delivering "hammer strikes" to the suspect's body and "a 'pain compliance' hand strike" to the suspect's head when the officers were "concerned that [the suspect] was trying to get a weapon while his hands were under his body."  The suspect sustained "abrasions around [his] left eye and forehead, as well as a small bruise on [his] right knee."  Hinson v. Bias, 927 F.3d 1103, 1121 (11th Cir. 2019).  Nevertheless, the Eleventh Circuit declared, "we cannot say that the fist blows the Officers used to get Hinson to follow the

instructions to produce his hands for cuffing inflicted an unreasonable amount of

force in light of the need to maintain the safety of Officers and others." Hinson v.

Bias, 927 F.3d 1103, 1121 (11th Cir. 2019).

In Hall v. McGhee, the Eleventh Circuit held officers used reasonable force

when they hit and kicked a suspect who failed to produce his hands for handcuffing:

> Mr. Reuben contends that his arms and hands were pinned under his
> stomach and he could not comply with the officers' demands to remove
> his hands. Even taking Mr. Reuben's version of events as true, a
> reasonable officer on the scene in the tense and quickly evolving
> situation could perceive this initial failure to follow instructions as an
> attempt to resist custody.

762 F. App'x 837, 842-43 (11th Cir. 2019). According to the Eleventh Circuit, every

reasonable officer would not believe that "hitting and kicking a potentially non-

compliant suspect[ ] was excessive and unlawful."

In Baker v. Clements, the Eleventh Circuit found no constitutional violation

when officers used strikes against a suspect who refused to surrender his hands for

cuffing:

> On appeal, Plaintiff challenges – as unconstitutionally excessive – only
> Defendant Officers' use of fist strikes while Plaintiff was face-down on
> the ground. The evidence, viewed in the light most favorable to
> Plaintiff, shows that Defendant Officers' use of force was objectively
> reasonable under the circumstances. When Defendant Officers
> employed the fist strikes, Plaintiff had just attempted to evade arrest by
> flight and had refused multiple orders to get on the ground, to stop
> resisting, and to give his hands to the officers. An objective officer
> could also have believed reasonably that Plaintiff – who had only a
> single hand in handcuffs – presented an immediate threat to Defendant
> Officers' safety when the fist strikes were used. Not only had Plaintiff

offered continuous physical resistance to Defendant Officers' efforts to restrain him, but we have said that an arrestee with only one hand handcuffed may pose a danger to officers because "without both hands shackled, the single handcuff could be used as a weapon." See Hoyt v. Cooks, 672 F.3d 972, 979 (11th Cir. 2012).

Given Plaintiff's active and aggressive resistance to arrest – which also constituted obstruction of an officer – an objective officer under the circumstances could have concluded reasonably that the use of fist strikes was necessary to complete Plaintiff's arrest. Faced with a "tense, uncertain, and rapidly evolving" situation, Defendant Officers made a split-second decision to employ force to gain control of the situation and to avoid the risk of serious injury. Under these circumstances, we cannot say that Defendant Officers' use of force was constitutionally unreasonable.

. . .

Plaintiff has failed to establish that Defendant Officers' use of force constituted a violation of his Fourth Amendment rights.

760 F. App'x 954, 957-58 (11th Cir. 2019).

In Mobley v. Palm Beach County Sheriff Department, the Eleventh Circuit upheld bone-shattering blows delivered to a suspect who fled, then failed to surrender his hands for cuffing:

Mobley waded out of the pond to the waiting police officers on the western bank of the pond, one of whom grabbed him by the hair and shoved him to the ground, pinning him there and ordering him to surrender his hands to be cuffed. While Mobley was on the ground, the officers struck and kicked him, including in the face. The officers' blows broke Mobley's nose, his teeth, and his plastic dental plate. He covered his face with his hands to protect it from the officers' blows. The officers also tased Mobley repeatedly while he was on the ground. Mobley eventually gave up, moved his hands from in front of his face and placed them behind his back. An officer handcuffed him, after which he was given medical attention.

52

. . .

> Officers on the scene of Mobley's arrest, responding to Deputy
> Bronson's alert bulletin, would have known that Mobley was a fleeing
> suspect who had struck a police officer with his truck and then led
> police on a reckless, high-speed chase. Those officers would also have
> seen Mobley wade into the middle of a pond in what they would have
> reasonably assumed was a continuing attempt to evade capture.
> Finally, those officers would have seen Mobley refusing to surrender
> his hands to be cuffed despite the application of escalating force and
> repeated use of a Taser. In those circumstances, striking, kicking, and
> tasing the resisting and presumably dangerous suspect in order to arrest
> him were not unreasonable uses of force and did not violate Mobley's
> constitutional rights.

783 F.3d 1347, 1351, 1355 (11th Cir. Apr. 2015).

In Williams v. City of Dothan, the United States District Court for the Middle

District of Alabama found no constitutional violation when officers repeatedly

struck or beat the plaintiff on his face and head during their struggle to handcuff him:

> After he began to run, the Plaintiff was tackled by one of the police
> officers on the scene, Officer Mock. Shortly before he was tackled, he
> threw the methamphetamine in hopes of getting rid of it. After the
> police officer tackled him, Plaintiff was positioned on the ground on his
> stomach. At that point, one or more of the officers began to strike or
> beat him on the face and on his head. He heard one officer use a racial
> epithet to say he planned to "teach [the Plaintiff] a lesson." The
> Plaintiff fell to the ground with his hands outstretched in front of him,
> and when the officers began to strike him he moved his hands in an
> attempt to "cover up" his head and protect himself from the blows
> inflicted by the officers. The officers eventually tased the Plaintiff
> twice, which prevented him from being able to move. After tasing him,
> the officers moved his hands behind his back and handcuffed him. The
> entire encounter lasted approximately thirty to forty-five seconds. No
> force was used against the Plaintiff after he was handcuffed and placed
> in a patrol car. The force inflicted on the Plaintiff before he was

53

handcuffed caused him some degree of injury, to the extent that the Plaintiff believed his nose had been broken.

. . .

The Plaintiff alleges that the individual Defendants used excessive force in effecting his arrest on April 20, 2012, by beating him while his arms were outstretched above his head and he was on his stomach, and as he moved his hands over his head in an attempt to protect himself from the force being used.

. . .

[T]he court concludes that like the plaintiff in the Mobley case, the Plaintiff has not "pointed to any circumstances before he quit resisting and was handcuffed that show the force applied against him was objectively unreasonable." 783 F .3d at 1356. The Plaintiff was being arrested for a serious offense, he fled both on vehicle and on foot, and the individual Defendants could have reasonably believed he was armed. The closest issue is whether the Plaintiff was resisting arrest, but the parties do not dispute that no force was used after the Plaintiff was handcuffed, nor do they dispute that during the beating he was moving his hands in an attempt to "cover up." The entire incident between the time the Plaintiff was tackled while in flight and the time he submitted to be handcuffed was thirty to forty-five seconds. Under Mobley and other Eleventh Circuit precedent, the Plaintiff has not shown that the force used was objectively unreasonable from the point of view of the arresting officers, the individual Defendants. The Plaintiff has not met his burden of showing that there was a constitutional violation.

No. 1:14-CV-287-WHA, 2015 WL 4635264, at *2-7 (M.D. Ala. Aug. 3, 2015). All

these cases support the officers.

Although the Complaint alleges the officers may have struck Wilkerson after "[his] hands were handcuffed and/or pinned to the ground," the video recordings prove that did not happen. (Ex. 2 at 23:56:09; Ex. 3 at 00:54:52; Ex. 4 at

23:56:15:00; Ex. 5 at 23:56:15:00.) Therefore, the court should disregard the Complaint's "visible fiction." Scott v. Harris, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776 (2007) ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."). In any event, the Complaint's conflicting hypotheses are speculative and, therefore, do not satisfy the Rule 8 pleading standard:

> Finally, while the third scenario potentially sets forth an agreement between the parties, its stated conspiracy theory – based on complete speculation, as demonstrated by the fact that **it is alleged in the alternative** to the other two hypotheses, where one of the other theories concedes that Deputy Campbell had no knowledge of Spence's alleged involvement in the crime – **is the type of conclusory allegation that cannot satisfy the pleading standard set forth in Rule 8, <u>Twombly</u> and <u>Iqbal</u>**. In short, Pittman **did not adequately plead** any clear agreement between the private defendants and a state actor **above the speculative level**.

Pittman v. State Farm Fire & Cas. Co., 662 F. App'x 873, 881 (11th Cir. 2016) (emphasis added).

Plaintiffs' conclusory characterization of Wilkerson's resistance as defensive is meaningless for qualified immunity analysis. (Doc. 48 at 6, ¶ 28.) "The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2019). "No right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." Young v. City of Killeen, 775 F.2d 1349, 1353 (5th Cir. 1985). "Even if [Wilkerson]'s motive was

innocent, the [officers] on the scene reasonably could have interpreted [Wilkerson]'s actions as resistance and responded with an amount of force that was reasonable to effect the arrest." Carpenter v. Gage, 686 F.3d 644, 650 (8th Cir. 2012).

Plaintiffs complain that Wilkerson was injured during his arrest and attach a photograph that depicts a swollen eye and cheek. (Doc. 48 at 6, ¶¶ 24, 27; Doc. 48 at 12, Ex. A.) However, "[g]overnment officials are not required to err on the side of caution." Marsh v. Butler Cty., 268 F.3d 1014, 1031 (11th Cir. 2001). "When more force is required to effect an arrest without endangering officer safety, the suspect will likely suffer more severe injury, but that alone does not make the use of that amount of force unreasonable. (If it did, deadly force could never be used no matter what the circumstances were.)" Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1355 (11th Cir. 2015). In Gomez v. Lozano, the United States District Court for the Southern District of Florida granted qualified immunity despite apparently comparable injuries:

> At no time did Mr. Gomez punch or kick the officers; he merely squirmed and tried to get loose. And yet Officer Lozano responded by punching Mr. Gomez both in the ribs and in the face. In addition, as Officer Lozano admitted, he threw these punches as hard as he could. The closed-fist punches to the face, moreover, caused severe injuries. Left bloodied and pummeled after the encounter, Mr. Gomez lost his front teeth and suffered a broken orbital cavity – all this over Mr. Gomez's minor resistance to arrest. Besides the extreme force used, a reasonable juror could conclude that Officer Lozano, unlike Officer Blanco, should have known that Mr. Gomez was suffocating and squirming because of the suffocation. After all, Officer Lozano sat on top of Mr. Gomez's head.

. . .

> Recently, an Eleventh Circuit panel held that qualified immunity attached where officers could not handcuff a suspect who resisted by stretching his arms so as to prevent the handcuffing. The police officers repeatedly used a taser on the suspect, despite the suspect's minor resistance, and the suspect died. See Hoyt, 672 F.3d at 977-78. The law did not clearly establish the suspect's constitutional rights, nor did the force exceed the hazy border. See id. The force used in that case and here are not equal, but they are somewhat similar. The level of resistance is analogous. And so I cannot conclude that Officer Lozano's actions exceeded the hazy border between acceptable and excessive force. Qualified immunity therefore attaches to Officer Lozano.

839 F. Supp. 2d 1309, 1319-21 (S.D. Fla. 2012). The officers in this case were entitled to rely upon this existing lower court decision without facing personal liability for their actions. See Pearson v. Callahan, 555 U.S. 223, 244-45, 129 S. Ct. 808, 823 (2009) ("Police officers are entitled to rely on existing lower court cases without facing personal liability for their actions.").

"The origins and purposes of qualified immunity remind us that although the circumstances of a case may be singularly unfortunate, regrettable facts do not automatically spell personal liability for police officers. We are bound to apply the reasonableness standard set forth by the Supreme Court and this Court." Hammett v. Paulding Cty., 875 F.3d 1036, 1047 (11th Cir. 2017). "In excessive force cases, we are mindful that officers make split-second decisions in tough and tense situations." Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013). "From the vantage of an officer whose life is jeopardized, a potential arrestee who is neither

physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death."   Menuel v. City of Atlanta, 25 F.3d 990, 995 (11th Cir. 1994).  "All the Constitution requires is that the force used be objectively reasonable, not that it be the absolute minimum necessary."   Harrell v. Decatur Cty., 22 F.3d 1570, 1579 n.1 (11th Cir. 1994) (Dubina J., dissenting), *majority opinion vacated, and dissenting opinion adopted*, 41 F.3d 1494 (11th Cir. 1995).   "The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases.  The only test is whether what the police officers actually did was reasonable."   Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994) (quoting Plakas v. Drinski, 19 F.3d 1143, 1148 (7th Cir. 1994)).

Wilkerson cannot meet his burden to demonstrate a constitutional violation. The officers move to dismiss the Fourth Amendment excessive force claim based upon qualified immunity.  See Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352, 1369 (11th Cir. 2011) ("because they have not met their Twombly and Iqbal pleading burden, we . . . dismiss the entirety of the insurers' claims").

### 3.    The Officers Did Not Violate a Clearly Established Right Against Excessive Force

Because the Complaint does not plausibly demonstrate a Fourth Amendment violation, the court need not reach the "clearly established law" prong of qualified immunity analysis.  See Williams v. Deal, 659 F. App'x 580, 582 n.1 (11th Cir.

2016) ("an exhaustive qualified immunity analysis is unnecessary if there is no constitutional violation"); Woodruff v. Mason, 542 F.3d 545, 559 n.17 (7th Cir. 2008) ("Because there was no constitutional violation in this case, we do not reach the issue of qualified immunity or absolute immunity."). "Without a constitutional violation, there can be no violation of a clearly established constitutional right." Burrell v. Board of Trs. of Ga. Military Coll., 970 F.2d 785, 792 (11th Cir. 1992). In any event, the Complaint also does not plausibly demonstrate that each individual defendant violated a clearly established constitutional right.

"Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted), each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018). "So we must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018).

"In the qualified immunity analysis, we generally compare the acts of each defendant to analogous case law to determine whether each defendant has violated a clearly established constitutional right." Corey Airport Servs., Inc. v. Decosta, 587 F.3d 1280, 1288 (11th Cir. 2009). "A Government official's conduct violates clearly

established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).  "The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him."  District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018).

"Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) (quoting Mullenix v. Luna, 136 S. Ct. 305, 309 (2015)).  The law must be "developed in on-point precedent."  Manners v. Cannella, 891 F.3d 959, 968 (11th Cir. 2018).  "This requires a high 'degree of specificity.'"  District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018) (quoting Mullenix v. Luna, 136 S. Ct. 305, 309 (2015)).  "Such specificity is especially important in the Fourth Amendment context, where the court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"

Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Saucier v. Katz, 533 U.S. 194, 205, 121 S. Ct. 2151, 2158 (2001)).

"This analysis must be undertaken in the specific crucible of the case, and not as a broad general proposition." Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012). "It is not enough that the rule is suggested by then-existing precedent." District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018).

"To survive a motion to dismiss based upon qualified immunity, the plaintiff must have alleged sufficient facts to support a finding of a constitutional violation of a clearly established law." Chandler v. Secretary of Fla. Dep't of Transp., 695 F.3d 1194, 1198 (11th Cir. 2012). "[T]he burden is on the plaintiff to show that, when the defendant[s] acted, the law established the contours of a right so clearly that a reasonable official would have understood [their] acts were unlawful." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993). "Plaintiff[s] cannot discharge [their] burden simply by making general, conclusory allegations of some constitutional violation or by stating broad legal truisms. Rather, as the courts have stated, plaintiffs must prove the existence of a clear, factually-defined, well-

recognized right of which a reasonable police officer should have known." Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir. 1989).

Given the similarity of the cases the officers cited to show that their force was not clearly excessive, Wilkerson cannot meet his burden to demonstrate a violation of clearly established law by each defendant. See Taylor v. Taylor, 649 F. App'x 737, 747 (11th Cir. 2016) ("Given the similarity of Nolin, Ms. Taylor also cannot show that a broader, clearly established principle applies with 'obvious clarity' to the particular factual situation faced by Deputy Taylor, or that the conduct at issue so obviously violated the Constitution that existing case law is unnecessary."). The Court should grant the officers qualified immunity against the § 1983 excessive force claim.

## V.    The State Law Claims

Count III asserts a state common-law claim for assault on Wilkerson's behalf and Count IV asserts a state law statutory claim under Alabama Code § 6-5-390 on Williams's behalf.  (Doc. 48 at 8-9, ¶¶ 37-44.)  Williams's claim is derivative of Wilkerson's state law assault and battery claim and is, therefore, dependent upon that claim. See Owens v. Lucas, 604 So. 2d 389, 391 (Ala. 1992) ("when two cases are consolidated for trial, and one is a derivative claim (such as a parent's claim for medical expenses and loss of services of the parent's injured minor child), and the other is the minor's claim based on personal injury resulting from the defendant's

negligence, if the jury finds for the defendant on the minor's claim for personal injury but finds for the parent on the parent's derivative claim, then the verdicts are inconsistent and contradictory, and the verdicts on both claims must be set aside on proper motion"); Smith v. Richardson, 171 So. 2d 96, 97 (1965) (holding "[the father's] claim for damages was dependent upon negligence on the part of [the defendant] toward [the minor child]").  Neither Count III nor Count IV states a claim upon which relief can be granted.

## A.    The Officers Did Not Commit the Tort of Assault-and-Battery

Plaintiffs cannot establish the state law tort of assault.  The Alabama Supreme Court has held that a federal court's determination that police officers used constitutionally reasonable force is dispositive of a state law assault and battery claim:

> The defendants argue that Walker is collaterally estopped from pursuing her assault and battery claim based on the federal court's determination that Watkins's use of force was not excessive and, therefore, did not violate the Fourth Amendment.  The federal court based its determination on federal precedent that allows the use of reasonable or *de minimus* force during an arrest, citing Graham v. Connor, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003); Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000); and Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997).  Walker's complaint very generally states an assault and battery claim against all defendants.  The only evidence relating to that claim relates to Watkins's use of force during Walker's arrest.
>
> "The plaintiff in an action alleging assault and battery must prove '(1) that the defendant touched the plaintiff; (2) that the defendant intended

to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.'" Harper v. Winston County, 892 So. 2d 346, 353 (Ala. 2004) (quoting Ex parte Atmore Cmty. Hosp., 719 So. 2d 1190, 1193 (Ala. 1998)).   However, this Court has stated: "In making the arrest, a police officer may use reasonable force and may be held liable only if more force is used than is necessary to effectuate the arrest."  Franklin v. City of Huntsville, 670 So. 2d 848, 852 (Ala. 1995), citing § 13A-3-27(a), Ala. Code 1975 ("A peace officer is justified in using that degree of physical force which he reasonably believes to be necessary, upon a person in order: (1) To make an arrest for a misdemeanor, violation or violation of a criminal ordinance . . . unless the peace officer knows that the arrest is unauthorized.").

The issue decided by the federal court is, therefore, identical to the issue raised by Walker's assault and battery claim.  The issue was actually determined by the federal court and was necessary to its judgment on Walker's § 1983 claim alleging an excessive use of force.  Therefore, the doctrine of collateral estoppel bars relitigation of this issue and, as a result, Walker's assault and battery claim.

Walker v. City of Huntsville, 62 So. 3d 474, 494 (Ala. 2010).  "If an officer's use of force is found to be 'reasonable' under the Fourth Amendment excessive force standard, a claim for assault and battery is precluded."  Elliott v. City of Pleasant Grove, No. 2:16-cv-00631-JHE, 2018 WL 1442863, at *9 (N.D. Ala. Mar. 22, 2018). Because the Complaint depicts reasonable force, the court should dismiss Count III's and Count IV's state law claims for failure to state a claim upon which relief can be granted.

**B.    The Officers Are Entitled to State-Agent Immunity**

Under Alabama Code § 6-5-338, the officers are also entitled to State-agent immunity against the state law claims.  In pertinent part, § 6-5-338(a) states:

> Every peace officer . . . shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a) (1975).

As police officers, the defendants qualify as peace officers for purposes of § 6-5-338.  See Borders v. City of Huntsville, 875 So.2d 1168, 1178 (Ala. 2003) ("As a police officer, Earle qualifies as a peace officer for purposes of § 6-5-338."); see also Ex parte City of Homewood, 231 So. 3d 1082, 1087 (Ala. 2017) ("it is undisputed that Officer Clifton and Officer Davis were employed as law-enforcement officers by Homewood; therefore, they are 'peace officers' for the purposes of § 6-5-338(a), Ala. Code 1975"); Suttles v. Roy, 75 So. 3d 90, 95 (Ala. 2010) ("Municipal peace officers . . . are 'deemed to be officers of this state' for purposes of Ala. Code 1975, § 6-5-338(a)") (quoting Ala. Code § 6-5-338(a) (1975)).  Accordingly, the officers are eligible for immunity under § 6-5-338.[7]

"The restatement of State-agent immunity as set out by [the Alabama Supreme Court] in Ex parte Cranman now governs the determination of whether a police officer is entitled to immunity under § 6-5-338(a), Ala. Code 1975."  Downing v.

---

[7] Even if the defendants were not police officers, "immunity applies to employees of municipalities in the same manner that immunity applies to employees of the State."  Ex parte Tucker, 303 So. 3d 367, 472 (Ala. 2019) (quoting City of Birmingham v. Brown, 969 So. 2d 910, 916 (Ala. 2007)).

City of Dothan, 59 So. 3d 16, 19 (Ala. 2010) (referring to Ex parte Cranman, 792

So. 2d 392, 405 (Ala. 2000)).  In pertinent part, the Cranman standard states:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> . . .
>
> > (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975;
>
> . . .
>
> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
>
> > (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
> >
> > (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

Ex parte Cranman, 792 So. 2d 392, 405 (Ala. 2000) (Category 4 modified by Hollis

v. City of Brighton, 950 So. 2d 300, 309 (Ala. 2006)).

In this case, the pivotal events occurred during an arrest.  (Doc. 40 at 5, ¶ 20.)

"Generally, arrests and attempted arrests are classified as discretionary functions."

Borders v. City of Huntsville, 875 So.2d 1168, 1178 (Ala. 2003).  Use-of-force

decisions are also discretionary functions.  See Thurmond v. City of Huntsville, 904 So. 2d 314, 326 (Ala. Civ. App. 2004) ("we conclude that the . . . officers were engaged in the exercise of a discretionary function . . . when they made the judgment call on how much force to use and under what circumstances to use it").  "Plainly, how and when to apprehend a fleeing suspect, and what degree of force is necessary to do so, are essential law-enforcement functions.  As such, officers making split-second decisions of the type described in the complaint are shielded by discretionary-function immunity from any tort claim under Alabama law." Curtis v. City of Tuscaloosa, No. 2:07-CV-1871-TMP, 2009 WL 10703089, at *4 (N.D. Ala. Mar. 30, 2009).

Upon a showing that the officers were engaged in a discretionary function, "the burden shift[s] to the plaintiff[s] to establish that the defendants acted fraudulently, in bad faith, or with malice or willfulness, in order to deny the defendants the immunity from suit otherwise provided them by § 6-5-338." Moore v. Adams, 754 So. 2d 630, 632 (Ala. 1999).  "Alabama's state-agent immunity doctrine . . . bars suit against law enforcement officers effecting arrests, except to the extent the officer[s] acted willfully, maliciously, fraudulently, in bad faith, beyond [their] legal authority, or under a mistaken interpretation of law, or if the Constitution or laws of the United States or Alabama require otherwise." Brown v. City of Huntsville, 608 F.3d 724, 741 (11th Cir. 2010).

"The Alabama Supreme Court has largely equated qualified immunity with discretionary-function immunity, and so the same facts which establish an entitlement to qualified immunity may also establish that the officers are entitled to discretionary-function immunity." Hunter v. City of Leeds, 941 F.3d 1265, 1284 (11th Cir. 2019). In Brown v. City of Huntsville, 608 F.3d 724, 742 (11th Cir. 2010), the Eleventh Circuit held an officer's constitutional use of force did not "show the required willfulness, maliciousness, fraud, or bad faith necessary to deny [the officer] state-agent and statutory, discretionary-function immunity." Under the facts of this case, Plaintiffs cannot meet their burden to strip the officers of State-agent immunity. The court should dismiss both Plaintiffs' state law claims because the alleged use of force was reasonable under the circumstances and, alternatively, because the officers are entitled to State-agent immunity.

## VI.   Conclusion

The Complaint does not state a claim upon which relief can be granted, and the defendants are entitled to immunity against all claims. All defendants ask the court to dismiss this action with prejudice.[8]

---

[8] James H. Pike has the express consent of Randall Morgan to affix his electronic signature to this document.

**/s/ James H. Pike**
James H. Pike
Alabama State Bar ASB-5168-P63J
SHEALY, PIKE, HORNSBY & FREEMAN
P.O. Box 6346
Dothan, Alabama 36302-6346
Tel. (334) 677-3000
Fax (334) 677-0030
Email: jpike@shealypikelaw.com
Attorney for Defendant Brandon Hicks


**/s/ Randall Morgan**
Randall Morgan
Alabama State Bar ASB-8350-R70R
HILL, HILL, CARTER, FRANCO, COLE &
BLACK, P.C.
425 South Perry Street
Montgomery, Alabama 36104
Tel. (334) 834-7600
Fax (334) 263-5969
Email: rmorgan@hillhillcarter.com

Attorney for Defendants Barry Rodgers, Jason
Barron, Brandon Kirkland, and Michael Watts

## VII.   Certificate of Service

I, James H. Pike, certify that on October 5, 2021, I electronically served this

document, via the CM/ECF system, upon:

Julian L. McPhillips, Jr.
K. David Sawyer
MCPHILLIPS SHINBAUM, LLP
516 South Perry Street
Montgomery, Alabama 36104

**/s/ James H. Pike**
James H. Pike